******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANGELO REYES
(SC 19712)

Palmer, Eveleigh, McDonald, Espinosa and Robinson, Js.

Argued November 17, 2016—officially released June 6, 2017

*Norman A. Pattis*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, *John Doyle, Jr.*, senior assistant state's attorney, and *Seth R. Garbarsky*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Angelo Reyes, appeals[1] from the judgments of conviction, following a jury trial, of two counts of arson in the second degree in violation of General Statutes § 53a-112 (a) (2), two counts of conspiracy to commit criminal mischief in the first degree in violation of General Statutes §§ 53a-115 (a) (1) and 53a-48 (a), and one count of conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-101 (a) (1) and 53a-48 (a). The defendant claims that the trial court improperly (1) instructed the jury on reasonable doubt, (2) failed to bar the assistant state's attorney (prosecutor), during voir dire, from informing certain prospective jurors that reasonable doubt is something less than 100 percent certainty, and (3) limited the defendant's right to cross-examine key state witnesses. We conclude that the defendant implicitly waived his unpreserved claim of instructional impropriety under *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), and we reject the defendant's other claims. Accordingly, we affirm the judgments of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our disposition of this appeal. At the time of the events in question, the defendant owned a Laundromat and several investment properties in the Fair Haven section of the city of New Haven. In October, 2008, the defendant paid two employees, Osvaldo Segui, Sr., and Osvaldo Segui, Jr., to set fire to 95 Downing Street in New Haven, a single-family residence that the defendant had sold to Robert Lopez and his mother, Carmen Lopez, in 2002. The defendant was angry that Robert Lopez would not sell the property back to him and informed Segui, Sr., that, after the fire, he intended to purchase the lot of land on which the residence had stood before the fire. Segui, Sr., and Segui, Jr., both of whom lived rent free in one of the defendant's properties, agreed to set the fire, and, in the early morning hours of October 9, 2008, they did so.

In May, 2009, the defendant enlisted Segui, Sr., and Segui, Jr., to set another fire, this time to a vehicle belonging to Madeline Vargas, a local businesswoman and employee of a nonprofit substance abuse services agency operating in Fair Haven. Although the defendant did not tell Segui, Sr., why he had had him set fire to Vargas' car, the evidence adduced at trial indicated that the defendant was motivated by spite—the result of an ongoing dispute between him and Vargas over Vargas' attempts, in 2008, to run an outreach program for local drug addicts in an empty parking lot near the defendant's Laundromat.

The defendant, Segui, Sr., and Segui, Jr., were subsequently charged with various offenses related to the

2008 and 2009 arsons. Prior to being tried in state court, the defendant was tried in federal court on unrelated arson charges. Segui, Sr., and Segui, Jr., also were charged in that federal case but agreed to testify against the defendant in exchange for reduced sentences. In the present case, Segui, Sr., and Segui, Jr., entered into plea agreements pursuant to which, in exchange for their testimony, they received a sentence that did not require them to serve any more time than they were required to serve in connection with the federal case. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court diluted the state's burden of proof by instructing the jury that "[p]roof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt." In his brief to this court, the defendant sought review of this unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[2] At oral argument, however, counsel for the defendant conceded that the defendant had waived this claim under *State* v. *Kitchens*, supra, 299 Conn. 482–83, the holding of which this court recently reaffirmed in *State* v. *Bellamy*, 323 Conn. 400, 403, 147 A.3d 655 (2016). In *Kitchens*, we held that, "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case." *State* v. *Kitchens*, supra, 482–83.

In the present case, the record establishes that the trial court provided defense counsel with a copy of its proposed jury instructions with adequate time for him to review and comment on them. On the last day of trial, the trial court noted for the record "that we've had a very productive informal charge conference earlier today. We'll have a formal charge conference on the record after the evidence is finished. However, to comply with certain suggestions made by counsel, I've made some modifications to a draft instruction I've earlier given counsel. I have now given . . . a redraft of [the] proposed instruction . . . to counsel. Also, I've given the clerk a copy of this latest draft instruction to comport with [*Kitchens*], and that [has been] marked as [court] exhibit A for identification only." That draft contained the following language: "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in

the world that we know with absolute certainty, and, in criminal law cases, the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, based on the evidence or lack of evidence, you have a reasonable doubt as to the defendant's guilt, you must give him the benefit of that doubt and find him not guilty."

Later that day, after the state had rested its case, the court conducted a formal charging conference. At that conference, the court noted that the parties and the court had "been exchanging drafts" and "had a very productive . . . [conference] this morning." The court further stated that it had "given an updated charge to the attorneys after [the] discussion this morning. A copy of that has been marked for [identification] as [court] exhibit [B]." The court then invited the parties to suggest any further "additions, subtractions, or modifications to the proposed" instructions. At that time, defense counsel raised a question with respect to the propriety of the proposed instruction on the meaning of the term "dangerous instrument . . . ." When the court inquired of defense counsel as to whether he had any other concerns about the charge, counsel responded that he did not. The court then instructed the jury in accordance with the revised charge. The instruction that the court gave to the jury with respect to reasonable doubt was identical to the reasonable doubt instruction contained in the earlier draft. In light of this procedural history, we conclude that the defendant waived his unpreserved claim of instructional error under the rule in *Kitchens*.[3]

II

The defendant next claims that the state's burden of proof was impermissibly diluted when, during voir dire examination of several prospective jurors, the prosecutor stated that proof beyond a reasonable doubt "is not proof to 100 percent certainty . . . ." Acknowledging that this unpreserved claim is not of constitutional magnitude, and thus not subject to appellate review under *Golding*, the defendant urges us to consider the claim under our supervisory authority over the administration of justice. We see no reason to do so.

As this court previously has explained, "bypass doctrines permitting the review of unpreserved claims such as [*Golding*] . . . and plain error [claims], are generally adequate to protect the rights of the defendant and the integrity of the judicial system . . . . [T]he supervisory authority of this state's appellate courts is not intended to serve as a bypass to the bypass, permitting the review of unpreserved claims of case specific error—constitutional or not—that are not otherwise amenable to relief under *Golding* or the plain error doctrine." (Citations omitted; footnote omitted; internal

quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 767–68, 91 A.3d 862 (2014); see also *State* v. *Reynolds*, 264 Conn. 1, 215, 836 A.2d 224 (2003) ("[o]ur supervisory powers are not a last bastion of hope for every untenable appeal" [internal quotation marks omitted]), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Consistent with this general principle, we will reverse a conviction under our supervisory powers only in the rare case that fairness and justice demand it. "[T]he exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Carrion*, 313 Conn. 823, 851, 100 A.3d 361 (2014). The present case presents no such scenario. To the contrary, the defendant has not cited a case from any jurisdiction in which a court has determined that it is improper, in the context of an appropriate instruction on reasonable doubt, to characterize the state's burden of proof as not requiring 100 percent certainty, much less that such a statement warrants the extraordinary review sought by the defendant. Because the prosecutor's remarks concerning reasonable doubt did not adversely affect the fairness of the defendant's trial, his supervisory authority claim must fail.[4]

### III

The defendant finally claims that the trial court violated his sixth amendment right to confrontation[5] by unduly limiting his cross-examination of Segui, Sr., and Segui, Jr., about their interest in the outcome of the trial and their motive to testify untruthfully. The defendant, who claims that he is entitled to review of this unpreserved claim under *State* v. *Golding*, supra, 213 Conn. 239–40, contends more specifically that the infringement of his confrontation rights resulted from the trial court's midtrial admonition to defense counsel that he would be subject to a disciplinary hearing at the conclusion of the trial for his violation of a pretrial order barring any mention, in the jury's presence, of the outcome of the defendant's federal arson trial. According to the defendant, this threat of future discipline by the court "could have had no other effect" on defense counsel than to inhibit his cross-examination of Segui, Sr., and Segui, Jr. In particular, the defendant argues that, "[a]t a time when [defense] counsel should have been focused on protecting [the defendant], his thoughts no doubt turned to protecting himself." The defendant further maintains that the trial court should have reserved comment on any future disciplinary action until the conclusion of the trial and that the court's failure to do so "signal[ed]" to defense counsel "that [a] robust challenge" to the testimony of Segui,

Sr., and Segui, Jr., was "off limits . . . ." The defendant's claim lacks merit.

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to trial, the state filed a motion in limine seeking to preclude the defendant from making any reference that might alert the jury to the outcome of the federal trial because of the risk that such a reference could confuse the jury and unduly prejudice the state. Prior to the start of jury selection, the trial court stated:

"The Court: . . . As everyone knows, this case was . . . previously the subject of a [federal] trial . . . . It's my understanding there was a verdict of not guilty, and we find ourselves here. Whether . . . the federal jury's verdict can at some point be admitted into evidence in the trial that's about to be commenced in this court can be determined in due time.

"But, I think, based on our conversation in chambers, we're agreed on the following: that the federal jury's verdict is not to be mentioned in the . . . voir dire; of course, people can be asked generally, have you heard about this case, and, if a particular juror mentions that they [have] . . . I think it is reasonable then to ask, well, do you know what happened . . . .

"But the verdict is not to be mentioned by counsel in voir dire without explicit permission of the court.

"And, second, that, during the trial itself, the federal jury's verdict will not be mentioned by counsel or witnesses without prior permission of the court, and, if somebody wants to bring it up, it's . . . a simple matter to say, Your Honor, may the jury be excused and then . . . [ask me for] permission [to bring it up].

"Is that agreeable to the state?

"[The Prosecutor]: Yes, it is, Your Honor.

"The Court: And is that agreeable to the defense?

"[Defense Counsel]: Yes, Your Honor."

When the court had finished addressing the parties, the prosecutor sought to clarify for the record that, contrary to the court's earlier statement, the charges in the present case, although similar in nature to the charges in the federal case, involved "completely separate incidents" of arson and, of course, violations of state, as distinguished from federal, criminal statutes.

Thereafter, prior to the commencement of trial, the court reiterated its earlier order regarding references to the federal trial, stating in relevant part: "The court previously ordered—and I believe there was no exception to this order—that there was to be no mention of the verdict in the federal trial without prior consent of the court. That's what the court ordered.

"Obviously, it seems to me that if any witness for

either party testifies and then, on cross-examination, the opposing party seeks to impeach that witness with some sort of prior inconsistent statement [from the federal trial], it can always . . . be done without mentioning the verdict. . . .

\* \* \*

"[A]nd it's not my [intention] to hamstring the defense on this. In fact, I think that . . . at some point it may become necessary to bring to the jury's attention [the fact] that there was some sort of prior proceeding— for example—what I certainly anticipate . . . is that, if any witness called by the prosecution or by the defense testifies in a way that is perceived to be different from [his] testimony in the federal proceeding, that witness can certainly be asked is it not true . . . that, in a prior proceeding, you said X, Y and Z. I don't see any way around that, and I've certainly had many cases like that . . . .

\* \* \*

"So [defense counsel], I'm certainly not here to hamstring you, and I can imagine circumstances in which the jury might have to know that there was a prior federal trial . . . ."

Defense counsel responded that it was inevitable that the jury would learn of the federal case when he cross-examined Segui, Sr., and Segui, Jr., about their cooperation agreements with the state because each of those agreements contained a provision limiting the signatory's prison exposure to time served in connection with the federal case. The trial court agreed that the jury might learn about the federal proceeding but stated that, "at this point . . . I'm going to stick with my original order, which is that the outcome of the federal proceeding may not be mentioned in the jury's presence without prior consent of the court. It seems to me what [defense counsel] says is intuitively correct to me, that it will . . . be obvious when . . . [the] cooperation agreement[s] [come] into evidence, that there was some sort of prior federal proceeding. That's something the court can live with, and, I mean, the most important thing is that the relevant evidence comes [in]. Whether the outcome of the federal proceeding is relevant—you know—right now, I don't see it. I mean . . . anything is possible, but my prior consent has to be obtained."

Segui, Sr., was the first of the defendant's alleged coconspirators to testify for the state. During cross-examination, defense counsel questioned Segui, Sr., extensively about his cooperation agreement in the federal case, including the fact that he was promised a reduced sentence regardless of the outcome of the federal trial. Reading from the transcript of the federal sentencing hearing, defense counsel asked Segui, Sr., whether it was true that the federal prosecutor informed the federal district court judge at the hearing that, "as

with . . . Segui, Jr., we've conveyed . . . to . . . Segui, Sr., [that] the verdict in the case is immaterial . . . ." Reading from the same transcript, defense counsel then asked Segui, Sr., whether the federal district court judge had informed him that, "[w]hile your assistance did not result in a conviction, the fact is . . . ." The prosecutor objected to defense counsel's question, and the jury was removed from the courtroom. Thereafter, the following colloquy ensued:

"The Court: [Defense counsel], I respect you a great deal, but you have expressed your outrage several times already at various things that [have] happened. I think that this is actually pretty outrageous, because we specifically addressed the question of whether the jury should be informed of . . . the outcome of the federal trial . . . and it was agreed that you were not to mention [it] without the specific consent of the court . . . .

"[Defense Counsel]: Your Honor, if I may?

"The Court: Please.

"[Defense Counsel]: I know that, at an earlier stage of the proceeding, that was said; however, subsequently, in this room before Your Honor on the record, when the state raised . . . one of its motions in limine concerning the outcome of the federal case, we discussed at length the fact that this witness' testimony . . . and his understanding is profoundly influenced by everything that happened . . . .

"The Court: Nevertheless, you needed my permission and you did not get it.

"[Defense Counsel]: It was my understanding that Your Honor, by that order, was granting permission. I—

"The Court: Your understanding is entirely erroneous, and you should know that. We will consult—in due time, transcripts will be consulted. You are certainly way out of line."

The trial court then asked whether the state intended to seek a mistrial. The prosecutor responded that he wanted to discuss the issue with his colleagues and that he would inform the court of his decision after the lunch recess. Before the trial resumed, the court asked defense counsel whether it was absolutely clear that for the remainder of the trial he was "[not] to mention or even imply the outcome of the federal trial before the jury in this case" without the court's prior consent. Defense counsel responded, "Yes, it is, Your Honor." The jurors then reentered the courtroom, whereupon the trial court instructed them "[to] please ignore the previous question. The objection to it has been sustained."

Following the lunch recess, the prosecutor advised the court that he was not requesting a mistrial, only a curative instruction informing the jury that the federal and state cases involved entirely different subject mat-

ters. The court agreed to instruct the jury as requested. The trial court subsequently addressed defense counsel out of the jury's presence, stating in relevant part: "I know you're in the middle of a criminal trial and you're of course . . . not only an experienced attorney but one of the most experienced attorneys in the state. You've been before me many times, and, as I said, I actually respect you a great deal.

"Having said that, I have certain responsibilities. I view what happened today as . . . a very grave matter. I have asked the court reporter to order . . . [the relevant transcripts].

"What I'm going to do in addition is . . . give you an opportunity . . . to order a transcript of whatever may have occurred in court between my pretrial order and what happened . . . this morning that you say may have allowed you to do what you did, and all of that can be taken into account in a hearing that will be scheduled after the conclusion of this trial.

"That's all I'm going to say right now, but you stand, I think, alerted both to the fact that this court views the matter as very serious and the court, unhappily— and I emphasize unhappily—will have to pursue the matter, but only after a fair hearing and giving you an opportunity to order . . . a transcript of anything that may have occurred in court that . . . may, from your point of view, mitigate the situation . . . ."

Thereafter, the trial court instructed the jury as follows: "So, ladies and gentlemen, I just want to give you one instruction concerning the question that was put to you about the federal [judge's] . . . sentencing remarks . . . .

"First, the objection to that question has been sustained. It's not part of the evidence; you should disregard it.

"Second, it's no secret—and . . . it's not meant to be a secret—that there was a federal proceeding in the fall of 2013 at which this witness [Segui, Sr.] and— you know—maybe some other witnesses—testified in which [the defendant] was also involved; but the subject matter of the federal trial and the subject matter of this [case] are quite different subject matters, and whatever happened in that trial one way or the other—and there's no evidence of what happened in that trial one way or the other—must have no bearing on what happens here because your sworn duty as jurors in this case, as in any case, is to decide the case based exclusively on the evidence presented in this court and the legal instructions you're given by the court at the end of the case. That's . . . what all jurors have in common in any case—you know—from the lowest fender bender case on up to capital murder, and anything in between. [You] have to decide the case based on the evidence before [you] in this case and not surmis[e] what . . . someone

else might've done on the basis of different evidence."

Following this instruction, defense counsel resumed his cross-examination of Segui, Sr., once again questioning him extensively about his state and federal cooperation agreements, his motive to testify untruthfully and related matters. When Segui, Jr., took the witness stand, defense counsel likewise cross-examined him at length along the same lines. Later, however, during his closing argument, defense counsel alluded a second time to the outcome of the federal case. Specifically, in addressing the testimony of Segui, Sr., and Segui, Jr., defense counsel stated that both men "had [pleaded] guilty to crimes—not, by the way, crimes charged in this case—other crimes entirely, federal crimes, of which my client has never been convicted . . . ." The prosecutor waited until defense counsel completed his closing argument and then objected to his reference to the federal case, at which time the trial court stated, outside the presence of the jury, as follows: "[A]s I have told you, following the jury's verdict, there will be a hearing . . . at which point you will be allowed to say anything you want in your defense, but you must know that that remark certainly [will not] be chalked up in your favor.

* * *

"You will be given an opportunity to say anything you want in your defense at the sanctions hearing, but you are—I am very sad to say—digging a grave that was pretty deep already . . . . Having said that, after the earlier transgression, the jury was instructed on this matter. I don't think that it needs to be instructed again."

On appeal, the defendant contends that the trial court's rebuke of defense counsel necessarily hindered him in his efforts to cross-examine Segui, Sr., and Segui, Jr., "about their motive to exaggerate in this case, or their motive to testify falsely, arising from their cooperation agreement[s] with the state and their previous failure to persuade a federal jury [that] they were telling the truth . . . ." The defendant also argues more generally that defense counsel "was unjustifiably impugned by the court and chilled in his advocacy on behalf of [the defendant] . . . ." We are not persuaded.

To the contrary, we agree with the state that the trial court acted well within its discretion in its handling of defense counsel's apparent violation of the pretrial order precluding any reference, in the presence of the jury, to the outcome of the federal trial, without the court's prior consent. The record also belies the defendant's contention that defense counsel was somehow restricted in his questioning of Segui, Sr., and Segui, Jr., regarding their cooperation agreements with the state, the favorable treatment they expected to receive in return for their testimony, and any other motive they may have had to testify untruthfully. Indeed, the record

reveals that defense counsel questioned both men extensively with respect to these issues. It therefore comes as no surprise that the defendant does not identify a single, relevant question that defense counsel would have asked either witness in the absence of the court's notice to defense counsel that he faced a possible sanction for his alleged violation of the court's order, or otherwise explain how counsel's advocacy on the defendant's behalf was chilled following that admonition. Indeed, in light of defense counsel's closing argument, during which he again adverted to the outcome of the federal case, it appears that the admonition had no effect on him.

The record also contradicts the defendant's contention that the trial court improperly prevented defense counsel from questioning Segui, Sr., and Segui, Jr., about the verdict in the federal case. As we previously indicated, prior to the start of the trial, defense counsel agreed, without objection, not to mention the outcome of the federal trial in the jury's presence without the court's prior approval. To obtain such approval, defense counsel needed only to make a proffer demonstrating that that federal verdict was relevant to an issue in this case. Defense counsel never once sought to make such a showing, even though the trial court made it abundantly clear that it was willing to entertain one at the appropriate time. In light of these facts, the defendant's assertion that the trial court improperly prevented defense counsel from cross-examining Segui, Sr., and Segui, Jr., about the result of the federal trial is unfounded.[6]

The judgments are affirmed.

In this opinion the other justices concurred.

[1] The defendant appealed from the judgments of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] In *Golding*, this court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*).

[3] We note that the defendant also claims that we should exercise our supervisory authority over the administration of justice to require this state's trial courts to use the pattern criminal jury instructions found on the Judicial Branch website, "absent a finding by the trial court that the recommended charge is insufficient, given the particular facts and circumstances of the case being tried." We decline the defendant's invitation. The Judicial Branch website expressly cautions that the jury instructions contained therein "[are] intended as a guide for judges and attorneys in constructing charges and requests to charge. The use of these instructions is entirely discretionary and their publication by the Judicial Branch *is not a guarantee of their legal sufficiency*." (Emphasis added.) Connecticut Judicial Branch Criminal Jury Instructions, available at http://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited May 22, 2017). Suffice it to say that our resolution of the defendant's unpreserved claim of instructional impropriety provides us with

no cause to review and consider the hundreds of pattern jury instructions set forth on the Judicial Branch website.

[4] As we previously explained, the defendant contends that we should adopt the pattern criminal jury instructions set forth on the Judicial Branch website and require their use in all criminal trials. See footnote 3 of this opinion. It bears noting that the pattern instruction on reasonable doubt provides in relevant part that "[p]roof beyond a reasonable doubt does not mean proof beyond all doubt; *the law does not require absolute certainty on the part of the jury before it returns a verdict of guilty*. . . ." (Emphasis added.) Connecticut Judicial Branch Criminal Jury Instructions 2.2-3 (revised to December 1, 2007), available at http://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited May 22, 2017). We perceive no meaningful distinction between this instruction and the prosecutor's challenged remarks on reasonable doubt.

[5] The sixth amendment right to confrontation is made applicable to the states through the due process clause of the fourteenth amendment. See *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[6] We note that the issue of defense counsel's alleged violation of the court's order has been the subject of unrelated litigation. See *Disciplinary Counsel* v. *Williams*, 166 Conn. App. 557, 142 A.3d 391 (2016). Nothing in this opinion should be taken as an expression of this court's view of that litigation.

---